2024 IL App (1st) 221744-U

FIRST DISTRICT,
FIRST DIVISION
March 25, 2024

No. 1-22-1744

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14 CR 13267 01 |
| SEAN SHELTON, | ) ) | Honorable |
| Defendant-Appellant. | ) ) ) | Stanley J. Sacks, Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Trial court properly denied defendant's motion to suppress inculpatory statement where it was voluntary under the totality of the circumstances. (2) Defendant's convictions for attempted murder are affirmed where the evidence was sufficient to show defendant had specific intent to kill the victims. (3) Prosecutor did not commit clear or obvious error during closing argument.

¶ 2    Following a jury trial, defendant Sean Shelton was convicted of one count of first-degree murder and two counts of attempted first-degree murder and sentenced to an aggregate term of 71 years' imprisonment. On appeal, defendant asserts that (1) the trial court erred in denying his motion to suppress his inculpatory statement, (2) the evidence was insufficient to prove he had

the specific intent to kill the attempted murder victims, and (3) the prosecutor's improper remarks during closing argument deprived him of a fair trial. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                      A. Motion to Suppress Inculpatory Statement

¶ 5        Defendant was charged with first-degree murder of Stephon Wright and attempted murder of Brenda Price and Antonio Adams stemming from a July 1, 2013 shooting. Defendant gave an inculpatory statement following questioning by detectives on July 1 and the early hours of July 2, 2014. On January 29, 2019, defendant filed a motion to suppress his inculpatory statement, arguing that it was "obtained as a result of psychological and mental coercion" since detectives lied when they told him he "ha[d] been identified" as the shooter, that his "phone [was] linked to the murder scene," and "that evidence put[ ] [him] at the scene."

¶ 6        At the July 16, 2019 suppression hearing, detective William Sullivan testified that he and his partner, detective Michelle Moore-Grose, were assigned to investigate Wright's murder on July 1, 2013. When he arrived on scene, an officer informed him that Wright was sitting in a parked car with Price and Adams when a tan car drove up and started shooting at them. Adams told him that a green car that drove past right before the shooting "might be involved."

¶ 7        Sullivan learned that a green vehicle had been impounded about four hours after the murder. An occupant of the vehicle, Avery Williams, was arrested for possession of a .40 caliber handgun, which was later "determined to be used in the murder." Williams told Sullivan that "Sean from Morgan Park" shot Wright in his mother's gold-colored Chrysler in "retaliation [for] the shooting of Marcellus Cunningham." Following his arrest on August 5, 2013, Marvis Boyd also told Sullivan that defendant had killed Wright. Defendant's cell phone records showed that

his phone connected to a cell tower approximately four and a half blocks away from the murder scene one minute after the shooting.

¶ 8        Defendant was arrested at 9:45 a.m. on July 1, 2014 and transported to Area South. He was placed in an interview room equipped with an Electronically Recorded Interview (ERI) system.[1] Sullivan and Moore-Grose met with defendant shortly after 12:00 p.m. They advised defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 9        Sullivan told defendant that he "had been identified" as the shooter since he was identified by Williams and Boyd. However, defendant was not "physically identified" until Price identified him in a physical lineup around 9:28 p.m. on the night of his arrest. Sullivan admitted that he lied when he told defendant he was "picked out in photo arrays" and "by people that were on the scene." Sullivan also told defendant that he was identified in three lineups when he was only identified in one of the two lineups related to this case,[2] and that cell tower evidence put his phone "right there" at the murder scene, although he could only "definitively say" that his phone was "in the vicinity."

¶ 10        The trial court indicated that it had reviewed defendant's ERI and the ERI transcript, which are included in the record on appeal. The ERI shows Sullivan and Moore-Grose entering the interview room at 12:18 p.m. Sullivan advises defendant of his *Miranda* rights and informs him that he was brought in to discuss Wright's murder. They tell defendant that he and his mother's car were "identified by witnesses that were at the scene" and that his phone was "pinging" "right there" at the murder scene. Sullivan and Moore-Grose tell defendant that they

_____

[1] The ERI system failed to capture the first and last hour defendant spent in the interview room.
[2] Defendant was a "filler" in an unrelated third lineup.

think he shot Wright in retaliation for shooting his friend Marcellus Cunningham (also known as "Marty") a couple of weeks before the murder. Defendant initially denies any involvement.

¶ 11    Defendant asks to call his mother around 1:20 p.m. Sullivan tells him he will have a chance to do so when he "go[es] downstairs." At 1:36 p.m., defendant asks, "So will I have to call my momma for a lawyer or something?" Sullivan readvises him of his right to an attorney, defendant indicates that he understands and continues answering questions. Sullivan tells defendant, "[Y]ou've been identified *** by people in photo arrays. Your car's been identified, your phone, your-your friends of these guys, all these things. There's a motive. Your friend Marty got shot. There's a lot of things here." Defendant still maintains that he was not there. Defendant asks to call his mother again around 1:44 p.m., right before the initial interview ends. Sullivan responds, "No, not at this point in time, okay?"

¶ 12    Detectives intermittently enter and exit the interview room over the next few hours. Defendant is given water and is escorted to the restroom multiple times. He is taken for lineups at 9:19 p.m. and is given food and cigarettes after he is brought back to the interview room.

¶ 13    The next interview occurs from 12:52 a.m. to 1:17 a.m. on July 2, 2014. Sullivan readvises defendant of his *Miranda* rights. Sullivan tells him that he was picked out in "all three" lineups and says, "Now's your opportunity to tell me what really happened and why." Defendant responds, "But out of everybody, *** how'd, I get picked?" and asks, "And I don't get a chance to call my mother or did anybody call to say what's going on?" Sullivan tells him that his mom was there and was worried about him. Sullivan says, "You've been picked out. Your phone puts you there. *** You need to tell the truth. You need to show that you're sorry for what you did. ***." Defendant admits to killing Wright shortly thereafter.

¶ 14    At the suppression hearing, the State argued that "if there were any variations between what the detectives told the defendant and what they knew to be true, they were absolutely minimal" and that defendant "was not in the slightest bit coerced." Defense counsel responded that the detectives' lies "lower[ed] [defendant's] ability to assess the information *** [and] to make a knowing and intelligent waiver of his rights," and that defendant's request to call his mom about a lawyer started "down that path" of invoking his right to counsel.

¶ 15    In denying defendant's motion, the trial court found that the detectives' statements were "[s]omewhat misleading," "[s]omewhat inaccurate," and "enhanced a little bit," but the court "[did not] think it affect[ed] [defendant's] comments at all after that." Additionally, defendant was *Mirandized,* did not invoke his right to counsel, and, as an adult, "had no right to talk to his mother at that point." The detectives "didn't use any force against [defendant]. They told him what they had, maybe not exactly, but they told him what they had" and "[t]he statements he made eventually were statements that he chose to make. No one forced him ***."

¶ 16                          B. Jury Trial

¶ 17    On the evening of July 1, 2013, Price[3] was hanging out with Wright, who was her boyfriend at the time, and his friend Adams in her 2000 Grand Prix parked outside of Adams' home near 103rd and Green Street. Wright was sitting in the driver's seat, Adams in the front passenger seat, and Price in the back passenger seat. Price saw a green car stop at the stop sign with a "hand *** pointing back" at them. When she said, "this car is pointing," another car with a "dent on the passenger side" pulled up to the driver's side of her car and started shooting at

---

[3] At the time of trial, Price was in federal custody in Indiana for conspiracy and robbery charges and had a prior robbery conviction.

them. Price was "in shock." Adams "took off running" out of the front passenger door, followed by Wright, who told her to run.

¶ 18   Price fell as she exited the car. As she was "crawling backwards [and] getting up," she saw the shooter, who she identified as defendant. Since it was "broad daylight," she had no difficulty seeing defendant and the "stress spot" or "bald spot" on his beard. Regarding the time of the shooting, Price indicated:

"Q: It happened about 8:00 p.m.?

A: Yes.

Q: This was July?

A: 7:00 p.m."

¶ 19   Defendant "cross[ed] past the trunk[,] running towards" Wright "as he's shooting." Wright was "stumbling" as he ran, since his "pants [were] *** hanging off his butt." Price heard a "snap" as Wright fell and hit a tree trunk. When she ran towards Wright, "[defendant] aimed the gun at [her] but [she] heard like a clicking noise" and it "didn't shoot." The driver said, "f*** that bitch, she pregnant, let's go ahead." Defendant got back in the car, and they drove away. Price held Wright as blood "gush[ed]" from his neck. The parties stipulated that Wright died from gunshot wounds to his neck and leg, and there was no evidence of close-range firing.

¶ 20   At some point after the shooting, Price's cousin's friend, Kent Smith, showed her defendant's picture on Facebook and she recognized him as the shooter. Price, however, failed to identify defendant in photo arrays shown to her by detectives on July 2 and July 12, 2013, even though she recognized him as "the person that killed [Wright]." Price explained that she lied to the police because she wanted "revenge" and was "listening to [her] cousins about *** letting the streets handle it," meaning, someone "would shoot [defendant]." The July 12 photo array

included a photo of Williams, whom she went to school with and had dated one of her friends. Williams was "[not] present at the time Stephon was shot."

¶ 21        On July 1, 2014, Price viewed a physical lineup, which was "different" from the photo arrays since "she could see [defendant] in person" and see the "spot underneath his chin." Price did not tell the police about the "spot" until after she viewed the lineup. She also viewed defendant's mother's car and identified it as the vehicle "[defendant] got out of."

¶ 22        Adams[4] testified that he did not remember what time the shooting occurred, but it was "still light out." At some point, a "dark color," two-door Pontiac G6 drove by, and another car pulled up to the driver's side door and started shooting at them. Adams' "head [was] down" and he "wasn't looking at the car." He heard gunshots, ran out of the passenger side of the car, and "never looked back." He heard gunshots and bullets "whizzing by" as he ran and "hop[ped] gates" until he was near the end of the block. When he returned to the scene, Wright was on the ground bleeding from his leg and neck. Adams did not see Price "anywhere."

¶ 23        Before the grand jury, Adams testified that an older model tan Chrysler pulled up next to them. He saw the arm of a medium complected African American holding a gun out of the passenger window. Adams looked back as he ran away and saw "bullets" and a "dent on the back" of the shooter's vehicle. Adams also identified defendant's mother's car as the shooter's vehicle, but denied doing so at trial.

¶ 24        Detective Sullivan and his partner, detective Moore-Grose, were assigned to investigate Wright's murder. When Sullivan arrived on scene, he saw a Grand Prix with four bullet holes in the driver's side door, a bullet hole in the front driver's side quarter panel, multiple bullet holes

---

[4] Adams was incarcerated in the Illinois Department of Corrections (IDOC) for aggravated unlawful use of a weapon by a felon and unlawful possession of a weapon by a felon at the time of trial and had a prior conviction for aggravated discharge of a firearm.

in the windshield, and firearms damage on the rear spoiler. He also observed twelve .40 caliber fired cartridge casings, one of which was on top of the trunk of the car, and blood on a tree to the northeast of the vehicle. When he interviewed Price on the night of the shooting and the following day, she told him that she ran "[b]ehind a bush," but could still "see the shooting." She described the shooter's facial hair as "well-groomed," but did not mention a "stress spot." Adams described the shooter's car as "tan or brown" and the shooter as a "medium complected" black male.

¶ 25    Around 12:35 a.m. on July 2, 2013, Sergeant Jesse Carreno responded to a call regarding a suspicious vehicle at 1406 West 112th Street. He observed a dark green Monte Carlo occupied by three individuals, including Williams, who was in the rear passenger seat. As Williams exited the vehicle, Carreno observed a semi-automatic Glock fall out of his pant leg onto the floorboard. Sullivan learned that a vehicle occupied by Williams, Justin Gullens, and Alonzo Cora was stopped "approximately four hours" after the murder and that two .40 caliber handguns were recovered from Williams and Gullens. The parties stipulated that the gun recovered from Williams was the "firearm that discharged the expelled shell cases recovered" from the murder scene.

¶ 26    After initially denying that he had done so, Boyd[5] admitted that following his arrest on August 5, 2013, he informed detectives that defendant admitted to killing Wright. However, he claimed that he "lied" and was "cover[ing] up" for Williams, who bragged about shooting Wright "shortly after the murder." About a month later, Williams asked Boyd to "help [him] out [and] just put everything on [defendant]." Boyd hung out with the same friends as defendant and

_____

[5] Boyd was incarcerated in the IDOC for commercial burglary and a pending murder case at the time of trial and had a prior conviction for unlawful use of a weapon by a felon.

considered him to be "still associate" and "cool," but he was closer to Williams. Boyd acknowledged that Williams had since been murdered and that he did not "tell anyone that [Williams] was the killer until after [he] was dead." The parties stipulated that Williams was shot and killed on June 30, 2015.

¶ 27        Boyd acknowledged testifying before the grand jury but claimed that Assistant State's Attorney Alexandra Molesky told him that "if [he] did not testify and say what [he] [was] supposed to say," he "would have more time added to [his 5-year sentence]" for the "guns [he] was locked up for." Molesky denied telling Boyd that his sentence would be altered in any way depending on his grand jury testimony.

¶ 28        Before the grand jury, Boyd testified that a couple of days after the murder, he and defendant were hanging out in defendant's mother's car when he asked Boyd to guess who killed Wright. When Boyd eventually guessed that defendant did it, defendant "started laughing." Defendant said that "Marcellas' baby momma" called him and told him that Wright was "outside 104th and Green." Holloway was driving defendant's mother's car. Defendant "[saw Wright], hopped out of the car, ran up, shot him one time in the leg." Defendant stepped over Wright when he "fell" and shot him "one time in the chest and the rest in head." Defendant told Boyd that he used a .40 caliber Glock, which Boyd was familiar with because "[e]verybody had access to it."

¶ 29        On May 16, 2014, Sullivan showed photographs of defendant's mother's vehicle to Adams, but he was not sure if it was the shooter's vehicle. Price said "it looked like [the shooter's car], but she had to see it in person to be sure." She identified it as the shooter's vehicle after viewing it in person after viewing the physical lineup.

¶ 30        Defendant was arrested on July 1, 2014. Sullivan and Moore-Grose questioned defendant about Wright's murder. Sullivan explained how he exaggerated and lied about some of the evidence against defendant, consistent with his testimony at the suppression hearing.

¶ 31        Portions of defendant's ERI were published to the jury. Defendant explained that it "hurt [him]" when his friend Marty was shot, and he was "tired of" Wright "com[ing] through shooting at [them] every day." He was driving down Green Street in his mother's car with Holloway when he saw Wright sitting in a car with a "light skin girl." Wright was in the driver's seat and the girl was in the front passenger seat. Defendant thought that someone named J.T. was with them and "two other people [were] in the back but [he] really couldn't *** tell who they were." However, defendant later said that he only saw Wright and the girl.

¶ 32        Defendant drove to 116th and Hale, where they retrieved a black .40 caliber gun from under a "rock" in a "long alley." When Sullivan later investigated the area, he discovered a piece of carpet under a large slab of concrete in an alley next to the railroad tracks. Defendant had Holloway drive because he just wanted to "scare" Wright, and thought Holloway might end up killing him. When they got back to Green, defendant started "shooting out the car." Wright tripped as he ran away. Defendant followed Wright out of the car and shot at him from over the trunk of Price's car. Defendant ran back to the car, and Holloway drove them back to Morgan Park. Defendant gave Holloway the gun, and they "split up."

¶ 33        Joseph Raschke, a special agent on the Federal Bureau of Investigation's cellular analysis survey team, conducted historical cell site analysis for the cell phones registered to defendant's brother Matthew Shelton, Williams, and Holloway. Raschke explained how historical cell site analysis can be used to determine an "approximate location" of a cell phone based on the phone's activity by analyzing which cell tower the phone connects to when a call is made or

received. This is "generally" the "tower that the phone is closest to," since it will have the "strongest, clearest signal." However, Raschke could not "place [a] phone at an address," just an "area" that he would expect the tower to provide coverage.

¶ 34 The phone registered to defendant's brother connected to a call at 7:48 p.m. on the night of the murder, "consistent with the cell phone being in the area of 116th and Hale." A call at 8:02 p.m. was consistent with the phone "being in the area of 10440 South Green," and calls at 8:07 and 8:11 p.m. were consistent with being in the Morgan Park area. Holloway's phone connected to a cell tower near 116th and Hale at 7:48 p.m., and near Morgan Park between 8:10 and 8:14 p.m. and from 8:15 to 9:00 p.m. Williams' phone connected to a cell tower near 85th and Cottage at 8:11 p.m. and 95th and Cottage at 8:17 p.m.

¶ 35 Gullens[6] testified for the defense. He was arrested with Williams and Cora "a little after midnight" on July 2, 2013. While they were in a processing room at the police station, Gullens asked Williams about the "small droplets on his pants." Williams told him that it was blood from when he "killed Steph." They were taken to another police station, where detectives questioned Gullens about the murder of "Stephon." He did not tell them what Williams had just told him because he "didn't want to be labeled a rat" and he "fear[ed] for [his] life" since "a lot of people [were] dying."

¶ 36 In closing, defense counsel maintained that Williams killed Wright and argued that there were a "multitude of reasons" why defendant's phone could have been near the murder, since a "huge commercial area" is just a block west of Green. The State responded that there was "no evidence" defendant "was visiting any of [the] businesses" in the area. Defense counsel objected,

---

[6] Gullens was incarcerated in the IDOC for an armed habitual criminal conviction and had prior convictions for unlawful use of a weapon by a felon and aggravated unlawful use of a weapon by a felon at the time of trial.

arguing that the State shifted the burden of proof to defendant. The trial court overruled the objection.

¶ 37    The jury found defendant guilty of first-degree murder of Wright and attempted murder of Price and Adams. On April 22, 2022, defendant filed a motion for new trial, arguing, *inter alia*, that the trial court erred in denying his motion to suppress and that the State improperly shifted the burden of proof to him by arguing that there was no evidence he was visiting businesses near the murder scene. During oral arguments, defense counsel asserted that under the recently decided Illinois Supreme Court case, *People v. Salamon*, 2022 IL 125722, the violation of defendant's statutory right to contact a family member contributed to the involuntariness of his confession.

¶ 38    In denying defendant's motion, the trial court found that defendant's statement about wanting to talk to his mom about a lawyer is a "fact to consider, but standing alone, it's not sufficient to suppress an otherwise voluntary statement." The trial court also concluded that "[i]t doesn't shift the burden to [defendant] in the slightest to argue [that there was] no evidence that he went there to conduct business." The court sentenced defendant to 45 years' imprisonment for murder consecutive to two concurrent terms of 26 years' imprisonment for the attempted murders.

¶ 39                                    II. ANALYSIS

¶ 40                        A. Voluntariness of Defendant's Confession

¶ 41    Defendant argues that the trial court erred in denying his motion to suppress because his confession was involuntary under the totality of the circumstances. In determining whether a confession is admissible, " '[t]he ultimate test' " is voluntariness. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). A

confession "may be used against [its maker]" where it "[is] the product of an essentially free and unconstrained choice." (Internal quotation marks omitted.) *Salamon*, 2022 IL 125722, ¶ 80 (quoting *Schneckloth*, 412 U.S. at 225). Generally, "the test of voluntariness is whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed." *People v. Gilliam*, 172 Ill. 2d 484, 500 (1996); see also *Wilson v. United States*, 162 U.S. 613, 623 (1896) (the "true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement of any sort").

¶ 42     Whether an individual's will was overborne depends on the totality of the circumstances. *In re D.L.H.*, 2015 IL 117341, ¶ 59. In making this determination, courts consider: (1) the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; (2) the legality and duration of the detention; (3) the presence of *Miranda* warnings; (4) the duration of the questioning; and (5) the presence of any physical or mental abuse by law enforcement, including threats or promises. *Salamon*, 2022 IL 125722, ¶ 81. Courts may also consider the use of trickery, deception, or subterfuge. *In re D.L.H.*, 2015 IL 117341, ¶ 59. "No single factor is dispositive." *Id.*

¶ 43     Where a defendant files a motion to suppress an inculpatory statement, the State bears the burden of proving that the statement was voluntary by a preponderance of the evidence. *People v. Richardson*, 234 Ill. 2d 233, 254 (2009). In reviewing a trial court's ruling on a motion to suppress, "we will accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence." *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). However, we review *de novo* the "ultimate question of the defendant's legal challenge to the denial of his motion to suppress." *Id.*

¶ 44        We agree with the trial court that defendant's statement was voluntary under the totality of the circumstances. Defendant was 22 years old at the time of his arrest, a high school graduate, and had a prior conviction for firearm possession. Defendant did not have a diminished mental capacity and exhibited a normal physical condition. He was also Mirandized before both interviews and Sullivan explained defendant's right to an attorney at length. When defendant asked, "So will I have to call my momma for a lawyer or something?" Sullivan responded,

> "[I]f you don't want to talk to us or decide you want a lawyer, *** what it means is that we will stop talking to you. *** But that's something you have to decide. Not your mom, not somebody your mom hires, but you because you're twenty two. *** And you know that any point in time you can say, I want a lawyer. I don't want to talk. And understand that at that point in time our discussion will end forever, today, okay?"

Defendant indicated that he understood and continued responding to the detectives' questions. Although defendant's pre-confession detention was approximately 15 hours, which is somewhat lengthy, the two interviews lasted about an hour and a half and half an hour, respectively, he was not handcuffed, was given food, water, cigarettes, and was escorted to the restroom multiple times. There was no presence of physical or mental abuse or threats. All of these factors weigh in favor of finding defendant's confession was voluntary.

¶ 45        Defendant nevertheless argues that his statement was involuntary because detectives "minimized the moral culpability for the offense" and "created an expectation of leniency." Specifically, he points to the detectives' suggestion that shooting Wright was out of character for him; that Wright shot his friend Marty; and that maintaining his innocence would make a judge view him as a "hard core gangbanger," but telling the truth "could help [him]." The State is correct that defendant has forfeited this argument by failing to advance any factual or legal

arguments regarding minimization and promises of leniency in his motion to suppress or motion for new trial. Compare *People v. Hughes*, 2015 IL 117242, ¶ 40-45 (defendant forfeited involuntariness argument where reasons supporting his argument on appeal were legally and factually distinct from those advanced in the trial court) with *Salamon*, 2022 IL 125722, ¶ 63 (defendant did not forfeit argument that statement was involuntary where the "crux of defendant's argument in the trial court" and on appeal was the same).

¶ 46        Forfeiture aside, the minimization tactics merely "play[ed] on [defendant's] ignorance, fears, and anxieties," which is permitted, "so long as [the police] do not magnify these emotionally charged matters to the point where a rational decision becomes impossible." (Internal quotation marks omitted.) *People v. Bowman*, 335 Ill. App. 3d 1142, 1153 (2002). And the detectives did not make any promises of leniency where they made no "suggestion of a specific benefit that will follow if defendant confesses." *People v. Johnson*, 285 Ill. App. 3d 802, 808 (1996). Sullivan and Moore-Grose merely encouraged defendant to tell the truth, which is insufficient to constitute a promise of leniency. See *People v. Dozier*, 67 Ill. App. 3d 611, 615 (1979) (confession voluntary where the police "merely encouraged the defendant to tell the truth in a noncoercive manner" and without promising a "specific benefit").

¶ 47        Defendant further asserts that the repeated denial of his requests to call his mother in violation of section 103-3(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/103-3(a) (West 2014)), rendered his confession involuntary. At the time of defendant's arrest, section 103-3(a) provided that "[p]ersons who are arrested shall have the right to communicate with an attorney of their choice and a member of their family by making a reasonable number of telephone calls or in any other reasonable manner" within a "reasonable time after arrival at the

first place of custody." 725 ILCS 5/103-3(a) (West 2014).[7] In *Salamon*, 2022 IL 125722, ¶¶ 103-104, our supreme court held that "the refusal to allow defendant's request for telephone access in accordance with section 103-3(a) is an essential factor in the totality-of-the-circumstances calculus" given the "inherently coercive nature of an *incommunicado* detention." However, the court made clear that it was not "creating an exclusionary rule when section 103-3(a) is violated." *Id.* ¶ 97. Rather, the "violation *** must be considered in ascertaining the voluntariness of an inculpatory statement." *Id.*

¶ 48    While the violation section 103-3(a) weighs in favor of suppression, *Salamon* is otherwise distinguishable from the case at hand. In *Salamon*, the court held that the defendant's confession was involuntary where he invoked his right to counsel; was not allowed to use a telephone to contact an attorney or family members to arrange for counsel; spent 24 hours alone and handcuffed to a wall in the interrogation room; and started "crying and pounding on the walls and door." *Id.* ¶¶ 9-11. Whereas, here, defendant was detained for approximately 15 hours prior to confessing, was not handcuffed overnight, or at all, in the interview room, and was not deprived of a phone call to prevent him from effectuating his invocation of his right to counsel.

¶ 49    Defendant's reliance on *Haynes v. Washington*, 373 U.S. 503 (1963) and *People v. Sanchez*, 2018 IL App (1st) 143899 to argue that detectives "convey[ed] a message that he would not receive access to a phone call *** until he made a statement," is likewise misplaced. Unlike those cases, the detectives here did not condition access to a phone call on defendant making a statement. See *Haynes*, 373 U.S. at 514 (confession involuntary where defendant "gave in only

---

[7] Section 103-3 has since been repealed (see Pub. Act 102-694, § 25 (eff. Jan. 7, 2022)). Section 103-3.5(a) of the Code now provides that persons in police custody "shall have the right to communicate free of charge with an attorney of his or her choice and members of his or her family as soon as possible upon being taken into police custody, but no later than 3 hours of arrival at the first place of detention." 735 ILCS 5/103-3.5(a) (West 2022).

after consistent denials of his requests to call his wife, and the conditioning of such outside contact upon his accession to police demands"); *Sanchez*, 2018 IL App (1st) 143899, ¶ 73 (confession involuntary where police "told [defendant] he could not call his mother until he told them the truth about the shooting").

¶ 50        Police deception is also relevant to a voluntariness determination, but "[t]he fact that a confession was procured by deception or subterfuge does not invalidate the confession as a matter of law." *People v. Melock*, 149 Ill. 2d 423, 450 (1992). The detectives here told defendant he was identified by eyewitnesses in photo arrays and three lineups and that that the cell phone evidence placed him "right there" at the murder scene. In reality, defendant was identified as the shooter by two non-eyewitnesses, was only identified by Price in a physical lineup, and the cell phone evidence only placed him in the vicinity of the scene of the murder. While detectives exaggerated the extent of the evidence against defendant, this is just one factor to consider in the totality of the circumstances calculus. *Id.* at 450; see also *People v. Martin*, 102 Ill. 2d 412, 427 (1984) (confession voluntary where State's Attorney falsely told defendant that his codefendant named him as the "triggerman"); *People v. Kashney*, 111 2d. 454, 465-66 (1986) (confession voluntary where State's Attorney told defendant that his fingerprints were found "all over the apartment").

¶ 51        Finally, we disagree with defendant's contention that the detectives "fe[d] [him] nearly all of the details they wanted to hear." Defendant provided a number of unique details about the shooting, including: that Wright was in the driver's seat and was with a "light skin girl"; that he retrieved a .40 caliber handgun underneath a rock in a long alley near 116th and Hale; that he had Holloway drive because he just wanted to scare Wright; that he shot at Wright from over the trunk of Price's car; and that he did not shoot at Wright from a close range.

¶ 52        Weighing the violation of section 103-3 and the presence of police deception against the numerous factors supporting the voluntariness of defendant's confession, as previously outlined, we cannot say that his will was overcome. Accordingly, defendant's confession was voluntary under the totality of the circumstances, and the trial court properly denied his motion to suppress.

¶ 53                        B. Sufficiency of Evidence for Attempted Murders

¶ 54        Defendant asserts that the evidence was insufficient to find him guilty beyond a reasonable doubt of attempted murder of Price and Adams where his "confession said that he only targeted *** Wright," he "did not even know that Adams was present," and Price's testimony "that Shelton briefly pointed a gun at her is not worthy of belief."

¶ 55        When reviewing the sufficiency of the evidence, it is not our function to retry the defendant. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). The relevant inquiry is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Accordingly, we " 'must allow all reasonable inferences from the record in favor of the prosecution.' " *Beauchamp*, 241 Ill. 2d at 8 (quoting *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)). We will not reverse a conviction unless the evidence is "so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt." *People v. Collins*, 214 Ill. 2d 206, 217 (2005).

¶ 56         To sustain a conviction for attempted murder, the State must prove beyond a reasonable doubt that (1) defendant performed an act that constituted a substantial step toward committing a murder and (2) that defendant had the criminal intent to kill the victim. *People v. Teague*, 2013 IL App (1st) 110349, ¶ 22. Specific intent to kill is rarely proven with direct evidence and, instead, " 'may be inferred from the circumstances, such as the character of the assault on the

victim and the use of a deadly weapon.' " *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52 (quoting *People v. Jones*, 184 Ill. 2d 51, 64 (1989)). "The necessary mental state may also be inferred from evidence that the defendant voluntarily and willfully committed an act whose natural tendency was to destroy another's life." *In re T.G.*, 285 Ill. App. 3d 838, 843 (1996).

¶ 57        Defendant argues that Price's testimony that defendant "aimed the gun at [her]" but it "didn't shoot" is not "worthy of belief" because she initially told the police that she hid behind a bush and Adams did not see Price when he returned to the scene. However, the jury, as the trier of fact, was "responsible for making determinations regarding the credibility of witnesses [and] the weight to be given their testimony" (*People v. Wright*, 2017 IL 119561, ¶ 70) and we "will not substitute [our] judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses" (*People v. Brown*, 2013 IL 114196, ¶ 48). Regardless, the evidence at trial showed that defendant shot at Price's car numerous times with a deadly weapon, knowing that Wright and a "light skin girl" were inside the vehicle. " 'The very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill.' " *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001) (quoting *People v. Thorns*, 62 Ill. App. 3d 1028, 1031 (1978)).

¶ 58        Defendant also argues that the State failed to prove his specific intent to kill Adams because he did not know Adams was in the car. While defendant's statement regarding who he saw in the vehicle was conflicting, the jury could have reasonably inferred that defendant knowingly shot into a vehicle occupied by multiple people other than Wright. Defendant's intent to kill Adams is shown through his use of a deadly weapon to shoot numerous times into an occupied vehicle, the 12 discharged shell casings, and the extensive firearm damage to Price's car. We therefore find that a rational trier of fact could have found defendant guilty of attempted

murder of Price and Adams.[8] See, *e.g.*, *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 80 (evidence was sufficient to sustain attempted murder convictions where defendants shot a "barrage of gunfire toward the vehicle that [the victim] occupied" and the jury could reasonably infer defendants knew she was in the vehicle); see also *People v. Green*, 339 Ill. App. 3d 443, 451-52 (2003) (jury could reasonably infer intent to kill from evidence that defendant fired a gun four to five times at officers seated in a vehicle).

¶ 59                                    C. Prosecution's Closing Argument

¶ 60                                    1. Shifting the Burden of Proof

¶ 61        Defendant argues that the State improperly shifted the burden of proof by arguing that there was no evidence he was patronizing businesses near the murder scene. "[A] criminal defendant has no duty to produce evidence at trial, and the State may never shift its burden of proof to a defendant." *People v. Mudd*, 2022 IL 126830, ¶ 34. However, a prosecutor has "wide latitude" in making a closing argument and may respond to comments by defense counsel which "clearly invite a response." *People v. Kliner*, 185 Ill. 2d 81, 151, 154 (1998).

¶ 62        Defense counsel argued in closing that there is a "huge commercial area" a block west of Green and, therefore, "ample reason for [defendant's] phone to be over there." The prosecutor responded, "[T]he defense can rattle on all the businesses *** that might be in the area *** but the fact of the matter is, there is no evidence that this defendant was visiting any of those businesses." This was an invited response to defense counsel's argument. Moreover, the State merely pointed out that there was no evidence supporting defense counsel's argument, which did not shift the burden of proof or suggest that defendant was required to present evidence. See

---

[8] Because we find the evidence sufficient to show defendant's specific intent to kill Price and Adams, we need not address defendant's argument that the transferred intent doctrine cannot "save[ ]" his attempted murder convictions.

*People v. Glasper*, 234 Ill. 2d 173, 212 (2009) (State did not shift burden of proof to defendant where it "pointed out that no evidence *** support[ed] defendant's theory of coercion").

¶ 63                                            2. Arguing Facts Not in Evidence

¶ 64        Defendant contends that he was deprived of his right to a fair trial because the State improperly argued facts not in evidence. Specifically, that (1) the shooting occurred at 8:00 p.m., (2) Price identified defendant in a physical lineup, and (3) Boyd and Adams feared defendant and defendant was involved in Williams' murder. Defendant admits that he has forfeited these claims of error by failing to object to them at trial or raise them in a posttrial motion. He nevertheless urges us to review these alleged errors under the plain error doctrine, or, alternatively, as a matter of ineffective assistance of counsel.

¶ 65        A reviewing court may consider an unpreserved error where a clear or obvious error occurred and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Under either prong, the defendant bears the burden of persuasion. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). The initial step in a plain error analysis is to determine whether a clear or obvious error occurred. *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 66        A prosecutor is afforded "wide latitude in making a closing argument and is permitted to comment on the evidence and any fair, reasonable inferences it yields." *Glasper*, 234 Ill. 2d at 204. A prosecutor may not, however, argue assumptions or facts not contained in the record. *Id.* A closing argument must be considered as a whole, and the challenged remarks must be viewed

in context. *People v. Simms*, 192 Ill. 2d 348, 397 (2000). We will not reverse a jury's verdict based on improper remarks made during closing arguments unless the comments resulted in "substantial prejudice" to defendant, meaning, "the improper remarks constituted a material factor in *** defendant's conviction." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007).

¶ 67        Defendant asserts that the prosecutor improperly argued that the shooting occurred at 8:00 p.m. because it "failed to prove" this fact during trial. During closing, the State argued that the murder occurred at "8 o'clock on a summer day" and that defendant received a call "at 8:02, one minute after the murder takes place." As outlined above, Price agreed that the shooting happened at 8:00 p.m., but then said the shooting occurred at 7:00 p.m. While it would have undoubtedly been beneficial to clarify the exact timing of the shooting from Price, the jury heard that the shooting happened at 7:00 or 8:00 p.m. Additionally, Carreno testified that Williams was arrested with the murder weapon at 12:35 a.m. and Sullivan testified that Williams was arrested "approximately four hours after the murder," which is consistent with the 8:00 p.m. timeframe. Therefore, the State did not argue facts not in evidence.

¶ 68        Defendant also maintains that the prosecutor "failed to prove" that Price identified him in a physical lineup but argued this fact during closing. We disagree. Price testified that viewing the physical lineup was "different" from the photo arrays because she could see "see [defendant] in person" and the "spot underneath his chin." Additionally, Sullivan testified during cross-examination, as follows:

"Q: In fact, at that point when you had that conversation with Sean, Brenda had not seen a lineup yet?

A: That's correct

Q: So when you told him he had been ID'ed by everybody on the scene, the only person that made an identification from on the scene hadn't even done that at that point?

\*\*\*

A: -- yes."

A reasonable inference from this exchange is that Price was the "only person that made an identification from the scene," which *both parties* argued in closing. Because the State's argument was based on a reasonable inference from the evidence presented, it was not improper. See *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005) ("In closing, the prosecutor may comment on the evidence and any fair, reasonable inferences it yields").

¶ 69    Defendant further asserts that there was "no basis" for the prosecutor's suggestion that "Antonio Adams and Marvis Boyd changed their testimony because they feared [defendant]" and that he "was responsible for Avery Williams's death."

¶ 70    During rebuttal closing argument, the prosecutor stated:

"What was interesting about Mr. Gullens' testimony was his discussion of fear. He told you that he feared for his life. Why? Because people involved in this case kept dying. Do you think it's possible that that fear contributed to some of the different stories that you heard on the stand? Do you think that that fear could be related to the death of Avery Williams?

With regards to Antonio Adams and Marvis Boyd, could a similar fear have played into their decision to lie on the stand when they testified before you? The major difference between their testimony in this trial and their testimony in the Grand Jury is the presence of this person. He's the main difference. The defendant wasn't present when they were testifying before the Grand Jury. The defendant wasn't present when they were

- 23 -

speaking to the police, but the defendant is present now and Avery Williams is dead. That's a pretty good motivation to change your story."

¶ 71   Defendant argues that the prosecutor's argument concerning Boyd and Adams was improper since there was "no evidence of threats or intimidation." "Generally, prosecutorial comments which suggest that witnesses are afraid to testify because defendant threatened or intimidated them, when not based upon any evidence in the record, are highly prejudicial and inflammatory." *People v. Sims*, 285 Ill. App. 3d 598, 605 (1996). However, the prosecutor here did not suggest that defendant threatened or intimidated Boyd and Adams. Rather, these comments "suggest that a witness may find it inherently intimidating to testify against a person who committed the offense, which is not improper." See *People v. Kindle*, 2021 IL App (1st) 190484, ¶ 50 (prosecutor's statements that testifying before a grand jury is different because " 'you don't have to sit in the same room as somebody who the last time you saw them they were beating someone to death at a bus stop' " and " '[m]aybe people get scared when they are sitting in the same room with a murderer' " were not improper). This is especially true for Adams, who was an eyewitness and attempted murder victim, and Boyd, who shared mutual friends with defendant and considered him to be "still associate" and "cool." Moreover, this was the only comment made regarding the witnesses' fear. In the context of closing arguments as a whole, we cannot say these comments were improper. See *id.*

¶ 72   Defendant's reliance on *People v. Mullen*, 141 Ill. 2d 394 (1990) and *People v. Armstead*, 322 Ill. App. 3d 1 (2001) is misplaced, as those cases involved arguments that the defendant threatened or intimidated the testifying witnesses. See *Mullen*, 141 Ill. 2d at 400-01 (prosecutor "clearly suggest[ed] that defendant threatened or intimidated witnesses" by arguing, " 'one of the most powerful things in this case was when [the witness] got up on the stand the first time, and

he said he did not want to answer. *** And use your common sense why he did not want to answer. *** Why don't they want to get involved? They do not want one of these… in their backs.' "); see also *Armstead*, 322 Ill. App. 3d at 14 (prosecutor's closing argument improper where they argued that the witness " 'had to have seen the face of the shooter. *** You know that—you know where the defendant lives. *** And you know where the victim lives. Think about it ladies and gentlemen.' "). Moreover, we do not believe that the prosecutor implied that defendant was responsible for Williams' death. Rather, the prosecutor was referring to Gullens' testimony about his fear of testifying in a case where people, including Williams, "kept dying."

¶ 73    Because we find no "clear or obvious" error occurred, plain error is inapplicable. For those same reasons, we decline to consider defendant's claim of ineffective assistance of counsel. *People v. Moon*, 2019 IL App (1st) 161573, ¶ 47.

¶ 74                                    CONCLUSION

¶ 75    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 76    Affirmed.